UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA FLOOD, | ) | |
| | ) | |
| Plaintiff, | ) | No. 02 C 9497 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| TY, INC., | ) | Magistrate Judge Arlander Keys |
| | ) | |
| Defendant. | ) | |

TO:  THE HONORABLE JOAN B. GOTTSCHALL
UNITED STATES DISTRICT JUDGE

### REPORT AND RECOMMENDATION

From mid-1995 to mid-1999, Sandra Flood worked for Ty, Inc.
as a sales representative, selling Ty's famous "Beanie Babies"
and other products to various retail accounts throughout Southern
California.  After leaving the company, she sued, alleging that
Ty breached the parties' Sales Representative Agreement by
failing to pay her commissions she claims she was owed, by
cutting the size of her sales territory, and by failing to fill
orders she placed.  She also alleged that Ty usurped one of her
biggest accounts, Play Co. Toys ("PlayCo"), thereby intentionally
depriving her of commissions, that Ty violated the Illinois Sales
Representative Act ("ISRA"), and that Ty asked her to move to
better serve her sales territory, then failed to reimburse her
for her moving expenses.  Ms. Flood sought an accounting, damages
to cover lost commissions and for violation of the ISRA, and
reimbursement of her moving expenses.  Ty has denied any
wrongdoing, and denies that Ms. Flood is entitled to any relief.

Throughout the course of this litigation, Ms. Flood and her attorneys have pursued an aggressive course of discovery, requiring both sides to put in a tremendous amount of time and effort and requiring both sides' attorneys to appear before the Court more times than the Court cares to recall. Despite that aggressiveness, and to the credit of the attorneys involved in the case (most recently on behalf of Ms. Flood, Andrew Hale of Rock Fusco & Garvey, and Greg Scandaglia of Scandaglia & Ryan), the parties were able to conduct extensive and amicable settlement negotiations. And, in the end, the parties settled Ms. Flood's claims for $120,000. Or so most everyone thought.

On January 26, 2005, Mr. Scandaglia wrote to the Court, advising that, on January 17, 2005, the parties had reached an agreement to settle the case, but that, thereafter, Ms. Flood had attempted to renege on that agreement. Obviously concerned, the Court asked the parties to appear on January 28, 2005. At that time, Mr. Hale and Mr. Scandaglia appeared before the Court to report that, despite their understanding that a settlement agreement had been reached, Ms. Flood was attempting to wrangle out of that agreement. The Court immediately set the matter for an evidentiary hearing on a rule to show cause as to why the settlement agreement should not be enforced. The Court scheduled the hearing for February 28, 2005, and specifically instructed Mr. Hale to tell his client that she was ordered to appear in

person at that time.

Also on January 28, 2005, the Court received a letter from Paul W. Thomas, an attorney in Carlsbad, California, who claimed to be writing on behalf of Ms. Flood. In his letter, Mr. Thomas advised the Court that Ms. Flood was in the process of trying to secure new counsel in Chicago, and he attached a declaration from Ms. Flood that addressed the purported settlement. Mr. Thomas stated in his letter that "I am certain you will agree [that the declaration] provides just cause to set aside any purported settlement agreement based on coercion and false pretenses." As it happened, the Court did not agree.

Despite Ms. Flood's declaration, the Court went forward with the hearing, as planned, on February 28th. Ms. Flood appeared, with her new counsel, Barbara M. DeCoster; Mr. Thomas also appeared and sat at Ms. Flood's table. On the other side, Mr. Scandaglia appeared, along with Teri Tully, an associate with Mr. Scandaglia's firm; Mr. Hale also appeared, represented by counsel, as did John ("Jay") Rock, an associate at Mr. Hale's firm who had been involved in the case throughout the discovery period.

Mr. Scandaglia took the stand first. He began by recounting the settlement efforts he and Ms. Flood's various attorneys had made. He testified that, very early on in the case, before any discovery had been done, he and Ms. Flood's first set of

attorneys talked about trying to settle the case, to no avail.
Tr. at 9. He testified that, after that, there were no
settlement discussions for a little over a year; he testified
that he and Mr. Hale first discussed settlement in November 2004.
Tr. at 9. At that time, Mr. Scandaglia testified, Ty was about
to spend significant amounts of money to retain experts and to
prepare a summary judgment motion, and he thought it might be a
good idea to talk about settlement before Ty incurred those
expenses. Tr. at 10. Mr. Scandaglia testified that Mr. Hale was
receptive to the suggestion, and the lawyers agreed that Mr. Hale
should prepare a written demand, which Mr. Scandaglia could then
take to his client. Tr. at 11-12. Mr. Scandaglia testified that
Mr. Hale did, in fact, come up with a number – $500,000, which
was, in Ty's view, completely out of the question and way beyond
any potential claim Ms. Flood could make. Tr. at 12-13.

Mr. Scandaglia testified that he and Mr. Hale held another
settlement meeting on December 8, 2004, and that, in preparation
for that meeting, he analyzed the various transactions on which
Ms. Flood claimed she was owed commissions, and researched some
of the key issues raised in Ms. Flood's complaint. Tr. at 12.
Mr. Scandaglia testified that he decided to share his analysis
and his research with Mr. Hale in an effort to further settlement
of the case; he testified that, in response to that information,
Mr. Hale agreed to revisit with Ms. Flood her settlement demand.

4

Tr. at 12-13. Mr. Scandaglia testified that, in January, Mr.
Hale called him to tell him that, after reviewing the information
Mr. Scandaglia had provided, Ms. Flood was prepared to settle the
case for $400,000 - a number that was, in Mr. Scandaglia's view,
still a non-starter. Tr. at 13.

Mr. Scandaglia testified that, in response to the revised
demand, he prepared a letter that set out in great detail Ty's
analysis of Ms. Flood's claims and explained precisely why Ty had
concluded that even her revised demand was absurd. Tr. at 13.
He testified that this letter also included, for the first time,
Ty's settlement proposal; Ty offered to settle the case for
$75,000. Tr. at 14.

Mr. Scandaglia testified that he and Mr. Hale met again on
January 13, 2005, and that they talked specifically about two
components of Ms. Flood's claim: they talked about her claim that
Ty owed her roughly $5,000 for expenses she had incurred in
moving, at Ty's suggestion, to San Diego; and they talked about
Ms. Flood's claim regarding the PlayCo account, which Ms. Flood
had served before Ty took it in-house. Tr. at 14-16. In fact,
Mr. Scandaglia testified, Ty's $75,000 offer consisted of the
moving expenses, plus 60% of the commissions that Ms. Flood would
have received from sales to PlayCo, had Ty not taken the account
in-house. Tr. at 24-25. As a result of those discussions, Mr.
Scandaglia testified, he and Mr. Hale determined that they might

5

be able to settle the case for $120,000 – the number that would cover both the moving expenses and 100% of the commissions Ms. Flood would have received on PlayCo sales, had Ty not taken the account in-house. Tr. at 16. At that time, neither lawyer actually had the authority to settle for that amount. But they agreed that Mr. Scandaglia would attempt to get Ty to agree to that amount, and, if it did, Mr. Hale would then take the number to his client. Tr. at 16.

Ultimately, Mr. Scandaglia testified, he was able to get Ty to agree to the $120,000, though it was by no means easy. Tr. at 16-17. Mr. Scandaglia testified that, on January 13th, he notified Mr. Hale that Ty had signed off on the deal, and, the next day, Mr. Hale contacted him to let him know that Ms. Flood had accepted the offer. Tr. at 18. Thus, by the end of the day on January 14th, at least from the perspective of the lawyers and Ty, the case was over.

Mr. Scandaglia testified that, after learning that Ms. Flood had accepted the settlement offer, he called his contact at Ty to let him know that the case had been settled, and he called the other attorneys at his firm to tell them to stop the work that they were doing on the case. Tr. at 18. He testified that, the next week – the week of January 17th – his firm began preparing settlement documents to memorialize the agreement that he and Mr. Hale had reached, and they eventually sent the documents over to

6

Mr. Hale for his review.  Tr. at 18-19.

Later in the week of the 17th, Mr. Scandaglia testified, Teri Tully, an associate at his firm, advised him that she had received a call from Mr. Hale suggesting that Ms. Flood was "having some unknown issues about the settlement."  Tr. at 19. He testified, however, that, soon thereafter, he received a message from Mr. Hale saying that, whatever the issues, Ms. Flood had worked through them, and the settlement agreement should be finalized.  Tr. at 19.  Thus, by the end of the week of January 17th, at least from the perspective of the lawyers and Ty, the case was still over.  Although the "loose ends" still needed to be tied up via the settlement documents, Mr. Scandaglia testified that, in his view, the parties had the material components of the settlement agreement in place - i.e., Ty would pay $120,000, and Ms. Flood would dismiss the case.  Tr. at 28-29.

According to Mr. Scandaglia, on January 25th, he received a fax from Mr. Hale that attached a letter from an attorney named Paul Thomas; the letter, Mr. Scandaglia testified, "came as quite a shock."  Tr. at 19.  According to Mr. Scandaglia, Mr. Thomas' letter stated that Ms. Flood was not going to settle the case for $120,000, that she was, instead, going to find yet another law firm to take the case to trial for her.  Tr. at 19-20.  Mr. Scandaglia testified that, after reading the letter, he notified his client of its contents, and then wrote a letter to the Court,

7

which then led to the scheduling of the evidentiary hearing. Tr. at 20-21.

With respect to the harm his client would suffer in the absence of an order enforcing the settlement agreement, Mr. Scandaglia testified first that "there will have been a lot of wasted effort," and his client will pretty much have to pay to go to trial because he could not, in good conscience, recommend that his client pursue any further settlement discussions with this woman; he also testified that, because he assumed Ms. Flood was participating in settlement discussions in good faith, he shared information with her and her attorney, some of which would have revealed Ty's analysis of her claims, as well as part of Mr. Scandaglia's trial strategy. Tr. at 21-23. In other words, to some extent, Ms. Flood's reneging will have compromised his client's position at trial.

After Mr. Scandaglia, Mr. Hale took the stand. He testified that, as part of the process of negotiating a settlement of this case, he sent Ty a letter discussing each of Ms. Flood's claims and demanding $500,000 to resolve the case. Tr. at 31-32. He testified that, on December 8, 2004, he and Mr. Scandaglia met to discuss that demand letter; in fact, he testified, he was quite impressed that Ty's attorneys had done a considerable amount of work and prepared detailed explanations of why Ty thought Ms. Flood's claims were weak. Tr. at 31-32. Mr. Hale found Ty's

analysis of Ms. Flood's CSR claim - a claim relating to the amount of commissions she was owed, separate and apart from the PlayCo commissions - to be particularly persuasive, and, based upon Mr. Scandaglia's presentation, and after analyzing Ty's research and data, he became convinced that Ty had the stronger position on that claim. Tr. at 32-34. Therefore, he testified, he went back to his client and tried to come up with a lower demand; ultimately, he testified, he agreed to go back to Ty with a demand of $400,000, though he suggested that he thought that demand was still too high. Tr. at 34.

Mr. Hale testified that he and Mr. Scandaglia next met on January 13th. Tr. at 35. He testified that, when he arrived, Mr. Scandaglia handed him a long letter that outlined, in still greater detail, Ty's position in the case, and then offered $75,000; the letter explained that Ty had arrived at that number by taking 60% of the PlayCo commissions Ms. Flood felt she was owed, plus $5,000 in moving expenses. Tr. at 35. Mr. Hale testified that, after reading the letter, he suggested to Mr. Scandaglia that a more fair settlement would give Ms. Flood 100% of the PlayCo commissions, which would put the number at $120,000. Tr. at 36. Mr. Hale testified that he and Mr. Scandaglia closed the January 13th meeting by agreeing that they would each try to get authority from their clients to resolve the case at that number. Tr. at 37.

Mr. Hale testified that, toward the end of the day on January 13th, he got a call from Mr. Scandaglia saying that Ty had authorized the $120,000 offer. Tr. at 37. He testified that he then contacted Ms. Flood; specifically, he testified that, on January 14th, he wrote her a letter explaining the situation and recommending that she agree to settle the case for $120,000. Tr. at 37. Mr. Hale testified that, shortly after he faxed the letter, Ms. Flood called him to discuss the offer. Tr. at 38. He described their conversation as follows:

> I said, "Did you read the letter?"
>
> She said, "Yeah, I read the letter."
>
> I said, "Well, you know I think this is a good offer. I think, you know, I really recommend you take it. We haven't been able to uncover any evidence that the CSR is accurate. We spent a lot of time and effort trying to do that."
>
> I told her that, you know, it was going to be a long row to hoe to go to trial, that would require her to come to trial, and that, you know, it would be a tough fight and I thought there was a better chance she'd get less than the 120. So I strongly recommended that she take it.
>
> And she sounded a little disappointed, but she said, "Okay, let's do it."

Tr. at 38-39. Mr. Hale testified that, immediately after hanging up the phone with Ms. Flood, he called Mr. Scandaglia to tell him that they had a deal; he testified that he asked Mr. Scandaglia to prepare settlement documents, and "that was that." Tr. at 39.

Mr. Hale testified that, some time in the early afternoon of

January 14th, he received a couple of voicemails from Ms. Flood, suggesting that she was having second thoughts and saying that she wanted to "see what my options are." Tr. at 39. He testified that, in response, he sent Ms. Flood an e-mail, advising her that he had already communicated her acceptance to Ty. Tr. at 39. Mr. Hale testified that, once again, he "thought that was the end of it." Tr. at 40.

Mr. Hale testified that, on Monday, January 17th, he received a letter from Mr. Scandaglia "confirming the terms of the settlement, which were simply the payment of $120,000 for mutual releases." Tr. at 40. He testified that on Wednesday, January 19th, he received a draft settlement agreement. Tr. at 41. That same day, he testified, Ms. Flood sent him an e-mail that "actually said she wasn't authorizing me to settle." Tr. at 41. Mr. Hale testified that Ms. Flood's e-mail upset him, because she was claiming that she never authorized him to settle, when she clearly had. He testified that he sent her back an e-mail saying that she *had* authorized him to settle, that he was not going to lie about it, and that if she was not going to go through with the settlement, he would withdraw from the case. Tr. at 42-43. In fact, the e-mail, which was admitted into evidence at the hearing, states as follows:

> Sandra: I sent you an email on 1-14-05 advising you that, per our discussion, and your authorization, I had confirmed the settlement with Greg Scandaglia. Thus, contrary to your message below, you already authorized

11

[sic] me to settle on the terms we discussed, which I did. Now, five days later, you are claiming you did not authorize me to settle, which is not true. I'm not going to lie to Ty and claim I was not authorized to settle, when I clearly was. If you're not willing to uphold your agreement, that's your decision, but I'll have no part in that and will be withdrawing. Please let me know your intentions.

Defendant's Group Exhibit 1.

Mr. Hale testified that he next heard from Ms. Flood when she called at about 5:00 p.m. on January 20th; he testified that, when the call came through, Mr. Rock happened to be in his office and heard the entire call. Tr. at 43. Mr. Hale testified that, given the e-mail exchange, he was expecting the call from Ms. Flood to be confrontational, but that in fact it was not. Tr. at 44. He testified that Ms. Flood told him she just wanted to see what her options were, and that, in response, he told her "[y]ou authorized me to settle for the 120. I did that. We have a deal. So, you know, no we can't do any better. It's too late for that. Based on your authority, I called Ty back and agreed to settle." Tr. at 44. He testified that, in response, Ms. Flood simply said "okay"; they hung up, and, again, he thought, "that was that." Tr. at 44.

Mr. Hale testified that, earlier in the week of the 17th, he had contacted Ty's attorneys to let them know that Ms. Flood was having some doubts about the settlement; he testified that, after the January 20th phone conversation with Ms. Flood, he called them back to tell them that things were fine and that the deal

12

was going to go forward. Tr. at 44.

Mr. Hale testified that, the next thing he knew, he received a fax from an attorney named Paul Thomas, saying that Ms. Flood was not going to sign any settlement agreement, and that she was in the process of trying to find new lawyers. Tr. at 44-45. Mr. Hale testified that he discussed the matter with Mr. Rock, and that they decided to immediately file a motion to withdraw and a motion for notice of an attorney's lien, which they did on January 26, 2005. Tr. at 45.

Mr. Hale testified that, at some point, he received a copy of the letter that Mr. Thomas had written to the Court attaching a declaration from Ms. Flood; he testified that the declaration was "just a bunch of lies." Tr. at 45-46. Specifically, he testified that, Ms. Flood's representations to the contrary notwithstanding, he never forced her or pressured her to settle the case, never told her that she would have to pay Ty's attorney's fees, never told her she owed his firm more than $170,000 in attorney's fees (in fact, he testified, they had a contingency agreement), and never told her that his firm's resources were exhausted or that he would not represent her if she declined to accept the settlement offer. Tr. at 46, 47-50. He testified that he "never pressured her at all"; he simply recommended that she take the offer and explained to her why he thought she should do so. Tr. at 50.

13

He testified that, when he saw her declaration, he was very angry and sent her an e-mail saying as much; he wrote: "[j]ust got your fax. Wow, what a bunch of lies. I'm stunned at what you're claiming. You know it's all B.S. I'm looking forward to testifying." Tr. at 46; Defendant's Group Exhibit 1.

After Mr. Hale, Mr. Rock took the stand briefly. He testified that he had worked with Mr. Hale on Ms. Flood's case against Ty, primarily assisting during discovery. Tr. at 55. He testified that he was sitting in Mr. Hale's office at about 5:00 p.m. on January 20, 2005, when Ms. Flood called. Tr. at 55-56. He testified that, before picking up the phone, Mr. Hale told him that the call might be confrontational and asked him to stay to hear the call; he testified that, after picking up the phone, Mr. Hale told Ms. Flood that Mr. Rock was in the room and asked if he could put her on the speaker phone, which he did. Tr. at 56. Mr. Rock testified that, in fact, the conversation was not at all confrontational; he testified that Ms. Flood expressed some concern about the settlement, saying that she knew (from talking to Paul Thomas, as it turned out) that the first offer isn't always the best one and that she wanted to make sure she was getting as much money as she could. Tr. at 56. Mr. Rock testified that, in response, Mr. Hale told her that they had already accepted the offer and that she could not get more money from Ty. Tr. at 57. Mr. Rock testified that Ms. Flood "seemed

14

disappointed," but that she also seemed to be resigned to the fact that the settlement was final, and that was how the conversation ended. Tr. at 57.

After Mr. Rock, Ms. Flood presented her side, taking the stand herself first. Ms. Flood first testified that, in November 2004, she authorized Mr. Hale to make a settlement demand to Ty of $500,000; she testified that she did not recall how Ty responded to that demand, if at all. Tr. at 58-59. She testified that, at some point, she authorized Mr. Hale to reduce her demand, but she could not recall what the revised demand amount was, nor could she recall whether Ty responded to that demand. Tr. at 59.

Ms. Flood testified that, on January 14, 2005, she learned for the first time that Ty had offered money to settle the case. Tr. at 59. She testified that, on that day, she got a call from her employer saying that she had received a fax at work from Mr. Hale, and that the fax indicated that she owed him $170,000. Tr. at 59. She testified that she immediately called Mr. Hale, that he told her he had sent her a "however-many-page fax," that she said she hadn't read it, but only knew about the bill part of the fax. Tr. at 61. She testified that Mr. Hale then told her about the settlement offer. Specifically, she testified,

> Andy told me that, you know, they had significant amount of time invested into the case and that they had apparently had a settlement meeting that I didn't know about the day before that, and this is actually the

15

first time I realized that. I didn't know that the settlement meeting had taken place the day before that.

And they had discussed the merits of the case and so forth and that he said really that we have so much time invested in this, our resources – resources are exhausted, we can't go any further with this. This is just not – you could be – you could end up getting less at trial if you went to trial. And he basically told me that I didn't have any option but to accept this – this offer.

Tr. at 62. She further testified that, at some point, she had asked Mr. Hale whether, if she did go to trial and lost, she could be responsible for Ty's attorney's fees, and he said that that was a possibility. Tr. at 62-63. She testified that, on the morning of the 14th, she was confused about whether, if she rejected Ty's settlement offer, she would be on the hook to her lawyers for the $170,000+ in fees they had racked up. Tr. at 63. She also testified that, after talking to Mr. Hale that morning, she "didn't really feel like I had any options. You know, I was under the impression that that was – that was as good as it was going to get unless, you know, they agreed to go to – to trial with me . . . ." Tr. at 64. She testified that, based on that, she authorized Mr. Hale to accept Ty's offer. Tr. at 64.

Ms. Flood testified that, after talking with Mr. Hale, she spoke with Paul Thomas, whom she characterized as "an attorney in California . . . [who has] known about the case since its

16

inception basically."[1]  Tr. at 65.  She testified that Mr. Thomas

assured her that, as a client with a contingency agreement, she

would not be responsible for the $170,000+ in attorney's fees

that were reflected in the bill she had supposedly received from

Mr. Hale and his firm.  Tr. at 65.  At that point, she testified,

she called Mr. Hale back and told him she wanted to know what her

options were.  Tr. at 65-66.

Ms. Flood testified that, on January 14th, she left several

voicemail messages for Mr. Hale, all to the effect that she

wanted to discuss her options and that she did not want him to

accept Ty's offer at that point.  Tr. at 66.  She testified that

she heard nothing back from Mr. Hale that day, and that she had

no contact with him from the 14th of January to the 19th of

January; she specifically denied receiving any e-mails or

voicemails from Mr. Hale during this time.  Tr. at 67.  She

testified that, on the 19th, when she still had not heard from

Mr. Hale, she sent him an e-mail, reiterating what she had said

in her voicemails - that she was not authorizing the acceptance

of Ty's settlement offer.  Tr. at 67-68.  She testified that, on

the 19th or the 20th, she received an e-mail from Mr. Hale saying

that "he had already sent me an earlier e-mail saying that it was

settled and that by my telling Ty - him, by my request for him to

---

[1]On cross-examination, Ms. Flood admitted that she knew Mr.
Thomas socially, that she had, in fact, dated him for a couple of
years.  Tr. at 73, 78-79.

17

tell Ty that it was not authorized was a lie and he wasn't going to have any part of it and he was dropping me." Tr. at 68.

Ms. Flood testified that, on January 20th, she and Mr. Hale spoke by telephone, that this was the conversation that was conducted by speaker phone, where Mr. Rock was present; she testified that Mr. Hale reiterated in that conversation that the case was already settled. Tr. at 68-69. She agreed with Mr. Hale and Mr. Rock that the conversation was not confrontational; she testified that:

> it wasn't confrontational because there wasn't anything to argue about at that point. They basically told me I didn't have any options, that the case had been settled, and, you know, that – went through the whole thing again about how they had so many hours into it and that, you know, I could get less at trial, etcetera, etcetera.
>
> And I said, well, then I guess there's no point in talking. So it wasn't as if I said, oh, okay, well, then I'll just go on my merry way.

Tr. at 69.

Ms. Flood testified that, immediately after hanging up with Mr. Hale and Mr. Rock, she called Mr. Thomas. Tr. at 63, 69. She testified that, on January 24th, she authorized Mr. Thomas to write a letter stating that she was not going to be signing any settlement agreement. Tr. at 70. She testified that she has not spoken to Mr. Hale since Mr. Thomas wrote that letter. Tr. at 71.

On cross-examination, Ms. Flood admitted that Mr. Hale never

18

actually told her that if she rejected the $120,000 offer he would stop representing her. Tr. at 72. She also admitted that she had authorized Mr. Hale to engage in settlement negotiations on her behalf, that, during the conversation she had with Mr. Hale on January 14th, she authorized him to settle the case under the terms he presented, and that, subsequently, based upon conversations she had with Mr. Thomas, she started to change her mind. Tr. at 73-74, 88-89, 103-04. She testified that, on January 14th, Mr. Thomas advised her that the settlement offer from Ty was "unacceptable," and she admitted that he so advised her without having reviewed any documents in the case. Tr. at 80. She admitted that Mr. Thomas was not representing her in the case, nor was he actively involved in the case. Tr. at 103. Yet, she testified, Mr. Thomas persuaded her, after the case was settled, that she should be able to go back and obtain an inspection of Ty's computer databases, which might yield information that would be helpful to her CSR claim. Tr. at 105-06.

Finally, Ms. Flood's attorney called Mr. Thomas to the stand. Mr. Thomas confirmed that he and Ms. Flood had a personal relationship and that they had been very good friends for a number of years. Tr. at 114. In fact, he testified, he helped her obtain the first set of lawyers she had in this case. Tr. at 114.

With respect to the settlement, Mr. Thomas testified that he got a call from Ms. Flood at about 9:00 a.m. on January 14th, that she was very confused about a bill she thought she had received from her attorneys, and that she was confused about whether she would be on the hook for that bill if she rejected the settlement offer. Tr. at 115-16. He testified that he told her that she would not have to pay Mr. Hale's attorney's fees, and that, if she had agreed to the settlement because she was worried she would have to pay Mr. Hale's fees, then the settlement was invalid. Tr. at 116. He testified that he also "did a quick computation on the bill," concluded that Mr. Hale's billing statements were "grossly inflated," and shared that opinion with Ms. Flood. Tr. at 117. He testified that he advised her to call Mr. Hale back, tell him that she wanted to hold off on the settlement, and tell him that she wanted to have a telephone conference with both him and Mr. Thomas; he further testified that, to his knowledge, Ms Flood did just that. Tr. at 117.

Mr. Thomas testified that he never had the conference call with Ms. Flood and Mr. Hale; instead, he testified, he got another call from Ms. Flood on January 20th, telling him that she had talked to Mr. Hale and that Mr. Hale had told her, again, that there was nothing she could do, that she was locked into the settlement agreement. Tr. at 118. He testified that, upon

20

hearing this, he thought

> how many times does she have to say no? I mean she
> left two voice mails on the 14th after the billing
> incident was cleared up. She sent an e-mail on the
> 19th. I thought, you know, no means no in this case,
> and clearly Mr. Hale was not getting that message.

Tr. at 118. He testified that he told Ms. Flood that he would

address the matter with Mr. Hale in writing, and that, on January

24th, he did exactly that. Tr. at 118. He testified that he

wrote to Mr. Hale and that, together with Ms. Flood, he prepared

the declaration that he sent to the Court. Tr. at 119.

On cross-examination, Mr. Thomas admitted that he had

basically counseled Ms. Flood to get rid of her first set of

lawyers. Tr. at 120-21. But, he testified, after Mr. Hale

entered the case, he got out of the case 100%, until January

14th, of course, when he again started counseling Ms. Flood from

behind the scenes. Tr. at 121. He also admitted, on cross

examination by both Mr. Scandaglia and Mr. Rock that his

accusations that Mr. Hale's firm padded its bill in this case

were extremely serious, and that he basically had no basis for

such accusations; he admitted that he had never checked the

docket in the case, that he was totally unaware of the work that

had been done, or the number of motions that had been filed in

the case, and that he had never even seen the time billing

entries that Mr. Hale's firm had prepared to track its work on

the case. Tr. at 121-23, 125-28.

21

The attorneys' cross-examination of Mr. Thomas also cast some serious doubt on Ms. Flood's version of the events of January 14th, and on the credibility of both witnesses. For example, telephone records introduced into evidence by Ms. Flood show that she did not, in fact, call Mr. Thomas right away after talking to Mr. Hale. This certainly undercuts substantially her testimony and the testimony of Mr. Thomas to the effect that she was distraught, confused and extremely upset at the end of that call - so much so that she needed Mr. Thomas' immediate counsel. See Plaintiff's Exhibit 1; Tr. at 129-37. In fact, the records show that she waited more than five hours before calling Mr. Thomas with her concerns. See Plaintiff's Exhibit 1; Tr. at 129.[2]

At the close of the evidentiary hearing, the Court invited the parties to file post-hearing briefs, specifically addressing the question of whether, to the extent the evidence showed that

---

[2]In an obvious attempt to bolster Ms. Flood's credibility regarding the series of telephone calls on January 14th, Mr. Thomas - after counsel pointed out to him that the telephone billing records showed that she had called him five hours after talking to Mr. Hale, and not immediately afterward - testified that he did not believe Ms. Flood had testified that she had called *him*; rather, she testified that he called *her*, which would explain, according to Mr. Thomas, why his phone number was not listed on Ms. Flood's bill. Tr. 132, 134. In reality, however, Ms. Flood *did* testify that she called Mr. Thomas, and she testified that she did so immediately after talking with Mr. Hale, neither of which is supported in the documentary evidence. Tr. at 63, 65-66. In the end, Mr. Thomas admitted that Ms. Flood *had* called him, tr. 134, as shown on the billing record, but, according to the record, that call was not placed until five hours after the initial phone call from Ms. Flood to Mr. Hale on that date.

Mr. Hale coerced Ms. Flood to accept Ty's settlement offer, that coercion would relieve her of her obligation to honor the settlement agreement. The Court also asked Ty to provide a copy of the settlement agreement it drafted and sent to Mr. Hale. The parties filed their briefs on March 21, 2005, and Ty included with its brief a copy of the settlement agreement. Thus, the question of whether any settlement agreement should be enforced is ripe for consideration.

## Discussion

Under Illinois law, which governs this dispute, *see. e.g.,*
*Lynch, Inc. V. SamataMason, Inc.*, 279 F.3d 487, 490 (7th Cir.
2002); *Abbott Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d
385, 387 (7th Cir. 1999), an oral agreement to settle a lawsuit
is binding and enforceable if there is an offer, an acceptance,
and a meeting of the minds regarding the material or essential
terms of the agreement. *Pritchett v. Asbestos Claims Management*
*Corp.*, 332 Ill. App. 3d 890, 896, 773 N.E.2d 1277, 1282 (2002).
A meeting of the minds between the parties will occur where they
"assent to the same things in the same sense on all essential
terms and conditions." *Id.* (citing *La Salle National Bank v.*
*International Ltd.,* 129 Ill. App. 2d 381, 394, 263 N.E.2d 506,
513 (1970)).

In this case, the record shows that all of the elements for
a valid oral contract existed as of January 14, 2005. Initially,

23

although Ms. Flood claims that she knew nothing about Mr. Hale's January 13, 2005 meeting with Mr. Scandaglia, there is no question that she had authorized Mr. Hale to conduct settlement negotiations on her behalf; she expressly admitted as much on the stand. Tr. at 88-89. And the record clearly shows that Ty made a valid offer on that day to settle the case for $120,000. Similarly, there is no question that, on January 14, 2005, Ms. Flood authorized Mr. Hale to accept Ty's offer to settle the case for $120,000; again, Ms. Flood expressly admitted as much on the stand. Tr. at 64, 74, 89. And on this issue, Mr. Hale's testimony is perfectly consistent with Ms. Flood's.

It is true that Ms. Flood sent Mr. Hale an e-mail saying that she was "not authorizing acceptance of [Ty's] offer to settle." See Defendant's Group Exhibit 1; Plaintiff's Post-Hearing Brief, Exhibit C. But she sent that e-mail on January 19th – five days after she accepted the offer to settle and five days after Mr. Hale communicated that acceptance to Ty; in other words, by the time she told Mr. Hale that he was not authorized to settle the case, the case was already settled. And, as Ty's counsel so aptly stated, "[b]uyer's remorse . . . is not a legal basis for invalidating the parties' settlement agreement." Ty's Memorandum of Law In Support of Enforcement of Settlement Agreement, p. 4.

As of January 14, 2005, the parties had reached an agreement

24

that Ty would pay Ms. Flood $120,000, that they would execute mutual releases, and that Ms. Flood would dismiss the case. These were the essential and material terms of the settlement agreement – in fact, they were basically the only terms of the settlement agreement. It is possible that Ty's January 17, 2005 letter confirming the settlement raised, for the first time, the issue of keeping the settlement terms confidential and the requirement that Mr. Hale secure a release of the attorney's lien filed by Ms. Flood's former attorneys. But those provisions are hardly essential or material and, therefore, would not affect the enforceability of the agreement. *See Rose v. Mavrakis*, 343 Ill. App. 3d 1086, 1090-91, 799 N.E.2d 469, 473-74 (2003)(that some terms of a contract may be missing or left to be agreed upon does not render an otherwise enforceable contract unenforceable; the lack of nonessential details will not render a contract unenforceable). And, in any event, the Court could find that the agreement was reached on January 17, 2005, and the outcome of this matter would still be the same.

Ms. Flood's main contention is that her acceptance of the settlement agreement should be vitiated – and the agreement invalidated – because she was under duress at the time and because Mr. Hale coerced her to accept the offer. To be sure, duress and coercion are grounds for invalidating the terms of a settlement agreement. *See Porter v. Chicago Board of Education*,

981 F.Supp. 1129, 1131-32 (N.D. Ill. 1997)(citing *Musgrove v. Petters*, No. 92 C 3267, 1992 WL 205858, at \*2 (N.D. Ill. Aug. 19, 1992)). Both have been defined as "'the imposition, oppression, undue influence or the taking advantage of the stress of another whereby one is deprived of the exercise of his free will.'" *Porter*, 981 F.Supp. at 1132 (defining duress as such)(quoting *Moore v. Cooper*, No. 94 C 788, 1996 WL 207187, at \*2 (N.D. Ill. April 24, 1996)); *In re Gibson-Terry & Terry*, 325 Ill. App. 3d 317, 327, 758 N.E.2d 459, 468 (2001)(defining coercion as such). The person asserting duress or coercion bears the burden of proving it by clear and convincing evidence. *Porter*, 981 F.Supp. at 1132; *Gibson-Terry*, 758 N.E.2d at 468. And, unfortunately for Ms. Flood, the record here does not even come close to supporting such proof.

Ms. Flood has alleged that she accepted the settlement, as least in part, because she believed that if she did not accept the settlement, Mr. Hale's firm would "drop her" and that she would have to pay Mr. Hale's firm more than $170,000 in attorney's fees. She testified that her beliefs on these issues were formed because of things that Mr. Hale said in their conversation on January 14th, and because of the billing statement that Mr. Hale sent to her on that day. But Ms. Flood could point to nothing in her conversations with Mr. Hale to support her claim; in fact, she admitted that he never

specifically said that he would withdraw if she rebuffed the settlement offer. And she admitted that he never told her that she had to cover his hourly fees; on the contrary she admitted that she knew that Mr. Hale's firm had taken the case on a contingency fee basis.

For his part, Mr. Hale denied that he said or did anything to give Ms. Flood the impression that, if she rejected the settlement offer, his firm would withdraw (he did say he would withdraw if she persisted in trying to renege on the agreement, but that was not until January 19th). Mr. Hale also testified that he sent Ms. Flood a billing statement, with the accompanying time entries showing what work had been done in the case, not to imply that she owed the money, but to show that his firm had really put in a lot of time and effort on her behalf and to show that his assessment of her claims and his recommendation about settlement were informed and well-founded. Mr. Hale's January 14, 2005 letter to Ms. Flood, which outlined the settlement offer and recommended that she accept it, is consistent with this testimony; the letter states

Sandra, we have spent a lot of time and effort on this case (see billing statement attached hereto showing $170,000 of attorney time) and, unfortunately, I agree with Ty that it will be very difficult for you to prevail on your other claims.

Defendant's Group Exhibit 1. Nowhere does the letter imply that Ms. Flood would actually have to pay the fees identified in the

billing statement.[3]

Additionally, Ms. Flood testified that she knew, long before the settlement offer even came up, that the firm had taken the case on a contingency fee basis, that that meant she would not have to pay attorney's fees, and that that meant, instead, that the firm would take one-third of any recovery she obtained from Ty. To the extent she was confused about her financial obligations to Mr. Hale's law firm, she testified that the confusion related solely to the question of expenses, which she has never claimed were significant enough to have been a factor in her decision to authorize settlement; indeed, she testified that she was perfectly capable of paying the expenses that the firm had incurred. Moreover, to the extent Ms. Flood misunderstood her financial obligations to her attorneys, that would not be enough to invalidate the settlement agreement. *See Hyde Park Union Church v. Curry*, 942 F.Supp. 360, 363 (N.D. Ill. 1996)(a unilateral mistake or misunderstanding is not sufficient

---

[3]In an obvious and disingenuous attempt to persuade the Court to cancel the February 28, 2005 hearing and set aside the settlement agreement without such a hearing, Mr. Thomas attached to Ms. Flood's declaration a billing statement that reflected Rock Fusco's billing on this case through December 31, 2004 – a total of $170,810.53. Mr. Thomas deliberately failed to include with his submission Mr. Hale's January 14, 2005 letter to Ms. Flood, to which the statement was attached; that letter referenced the statement and made clear that the statement was intended merely to show the amount of attorney time that had been spent on the case. Although the statement purports to show the "total amount now due," when read in context with Mr. Hale's letter, the statement could not reasonably have led Ms. Flood to believe that Mr. Hale would be seeking to collect that amount from her.

to compel recision of a settlement agreement where counsel for the parties accepted the settlement terms on behalf of their clients)(citing *Brewer v. National Railroad Passenger Corp.*, 256 Ill. App. 3d 1083, 628 N.E.2d 331, 335 (1993)).

In addition to claiming duress based upon Rock Fusco's attorney's fees, Ms. Flood asserts that she accepted the offer because she believed that if she rejected it: she would be responsible for Ty's attorney's fees; (2) Mr. Hale's firm would drop her; and (3) she was likely to get less money at trial.

The Court quickly rejects any argument based upon the last two points. As Ty's counsel forced her to admit on cross-examination, Ms. Flood had survived the departure of at least two law firms already, and therefore knew, or should have known, that her fight against Ty could proceed despite Mr. Hale's departure. And to the extent Mr. Hale shared his honest assessment of the relative merits of the parties' trial positions, he cannot be faulted for that; indeed, that was part of his job as her lawyer.

Moreover, with respect to Mr. Hale's assessment of Ms. Flood's claims, there is nothing in the record to suggest that he was wrong. Mr. Hale testified that Ty had prepared and documented a detailed analysis of Ms. Flood's CSR claim – the claim that appears to have accounted for the bulk of Ms. Flood's $400,000 settlement demand – and concluded that it lacked merit; he further testified that he found that analysis to be quite

persuasive, so much so that he advised her, in response, that her claim was unlikely to succeed, and that her strongest claims related to her allegations about the PlayCo account and her moving expenses. On those claims – the only claims with any merit, according to all of the lawyers involved in the case – Mr. Hale succeeded in persuading Ty to pay 100%; the settlement amount consisted of 100% of the PlayCo commissions that Ms. Flood would have received if Ty had not taken the account in-house, and 100% of the moving expenses Ms. Flood claims she incurred at Ty's insistence. Thus, Ms. Flood would be hard pressed to show that Mr. Hale failed her in some way in negotiating the settlement. Certainly, her speculation that an examination of Ty's database might reveal inconsistencies that might support her CSR claim is not enough to denigrate the settlement outcome.[4]

As for Ms. Flood's alleged concerns about her potential liability for Ty's attorney's fees, the Court finds that her claims on this score are baseless and utterly incredible. Although she testified that Mr. Hale implied that she might be on the hook for Ty's attorney's fees, Mr. Hale denied that he ever said or implied anything of the kind. And, having heard both witnesses testify, the Court can safely say that Ms. Flood would

---

[4]As an aside, even if the Court declined to enforce the settlement agreement, it is extremely unlikely that Ms. Flood would ever have the opportunity to examine Ty's databases; discovery is closed, and, even when it was open, the Court consistently rejected Ms. Flood's attempts to gain access to the databases.

lose any he-said-she-said battle she might wage with Mr. Hale.

Quite simply, when presented with the $120,000 settlement offer, Ms. Flood could have told Mr. Hale that she needed time to consider the offer; she could have told him that she wanted to reject the offer. Instead, after reading Mr. Hale's letter and after discussing the matter in a 14-minute telephone call, she authorized him to accept the offer on the spot. Mr. Hale then relayed that acceptance to Ty's counsel and the deal was sealed. Some time later, after being riled up by Mr. Thomas – an attorney who had never formally been involved in the case, and who had essentially no idea what had transpired in the case or what was going on presently in the case (except for what he had heard from Ms. Flood) – Ms. Flood started to wonder whether she might not be able to squeeze more money out of Ty. The law can neither condone nor reward such behavior. As the Seventh Circuit has said, "[a] party to a settlement cannot avoid the agreement merely because he subsequently believes the settlement insufficient . . . ."; a party who previously authorized a settlement "remains bound by the terms of the agreement" and cannot simply "change[] his mind." *Glass v. Rock Island Refining Corp.*, 788 F.2d 450, 454-55 (7th Cir. 1986)(citations omitted).

Finally, the Court notes that, even if the record supported the notion that Mr. Hale had somehow failed Ms. Flood in terms of the settlement agreement – whether by taking too dour a view of

her case, by not holding out for more money, or by not pursuing her claims with sufficient vigor, the appropriate remedy is not to relieve Ms. Flood of her obligations under the settlement agreement. *See Taylor v. Gordon Flesch Co.*, 793 F.2d 858, 864 (7th Cir. 1986)("to the extent [the client's] decision to settle may have been based upon the incompetency of his counsel, his remedy lies in an action for legal malpractice, not in an action seeking to renege on a settlement agreement.") (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962)).

## Conclusion

For the reasons set forth above, the Court finds that the parties reached a valid settlement agreement on January 14, 2005, and that the parties' agreement is memorialized in the document entitled "Confidential Agreement of Settlement and Mutual Release," which appears as Exhibit E to Ty's Memorandum of Law in Support of Enforcement of the Settlement Agreement. The Court further finds that Ms. Flood's claim that she was coerced to accept the settlement offer is baseless and incredible. The Court, therefore, recommends that the district judge grant Ty's motion to enforce the settlement agreement, and dismiss the case with prejudice.

Dated: April 5, 2005

RESPECTFULLY SUBMITTED:

ARLANDER KEYS
United States Magistrate Judge


Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable Joan B. Gottschall. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut General Life Ins. Co.,* 900 F.2d 1032, 1039 (7th Cir. 1990).